FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 07, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RAFAELA R.,[1] <br>             Plaintiff, <br><br>    vs. <br><br> ANDREW M. SAUL, <br> COMMISSIONER OF SOCIAL <br> SECURITY,[2] <br>             Defendant. | No. 1:19-cv-03013-MKD <br><br> ORDER GRANTING PLAINTIFF'S <br> MOTION FOR SUMMARY <br> JUDGMENT AND DENYING <br> DEFENDANT'S MOTION FOR <br> SUMMARY JUDGMENT <br><br> ECF Nos. 15, 16 |

Before the Court are the parties' cross-motions for summary judgment. ECF Nos. 15, 16. The parties consented to proceed before a magistrate judge. ECF No.

---

[1] To protect the privacy of plaintiffs in social security cases, the undersigned identifies them by only their first names and the initial of their last names.

[2] Andrew M. Saul is now the Commissioner of the Social Security Administration. Accordingly, the Court substitutes Andrew M. Saul as the Defendant and directs the Clerk to update the docket sheet. *See* Fed. R. Civ. P. 25(d).

ORDER - 1

7. The Court, having reviewed the administrative record and the parties' briefing, is fully informed. For the reasons discussed below, the Court grants Plaintiff's motion, ECF No. 15, and denies Defendant's motion, ECF No. 16.

## JURISDICTION

The Court has jurisdiction over this case pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1159 (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance." *Id.* (quotation and citation omitted). In determining whether the standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. *Id.*

In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence in the record "is susceptible to more than one

ORDER - 2

rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012). Further, a district court "may not reverse an ALJ's decision on account of an error that is harmless." *Id.* An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id.* at 1115 (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

## FIVE-STEP EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the Commissioner considers the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(b).

If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two. At this step, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. § 404.1520(c). If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(c).

At step three, the Commissioner compares the claimant's impairment to severe impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. § 404.1520(d).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity (RFC), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past (past relevant work). 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1). If the claimant is not capable of adjusting to

other work, analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that 1) the claimant is capable of performing other work; and 2) such work "exists in significant numbers in the national economy."  20 C.F.R. § 404.1560(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

On April 1, 2014, Plaintiff applied for Title II disability insurance benefits alleging a disability onset date of March 4, 2014.  Tr. 226-34.  The application was denied initially, Tr. 83-85, and on reconsideration, Tr. 89-93.  Plaintiff appeared before an administrative law judge (ALJ) on November 6, 2017.  Tr. 38-56.  At the hearing, Plaintiff requested a closed period of disability from March 4, 2014 through February 28, 2016.  Tr. 42-43.  On November 27, 2017, the ALJ denied Plaintiff's claim.  Tr. 15-37.

At step one of the sequential evaluation process, the ALJ found Plaintiff had engaged in substantial gainful activity from March 1, 2016 through the date of the decision.  Tr. 23.  However, the ALJ determined that there had been a continuous 12-month period, from March 4, 2014 through February 28, 2016, during which

Plaintiff did not engage in substantial gainful activity, and the ALJ's findings addressed that time period. Tr. 24. At step two, the ALJ found that Plaintiff had the following severe impairments: major depressive disorder and post-traumatic stress disorder. Tr. 24.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 24. The ALJ then concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations:

> [Plaintiff] could perform simple routine tasks in a predictable work environment with tasks predetermined by the employer. She could engage in small group interaction with coworkers, but should have no contact with the general public.

Tr. 25.

At step four, the ALJ found Plaintiff was capable of performing her past relevant work as a seed-cleaner operator and an agricultural produce sorter. Tr. 30. Although the ALJ found Plaintiff capable of performing past relevant work, the ALJ continued to step five and determined that, considering Plaintiff's age, education, work experience, RFC, and testimony from a vocational expert, there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as linen room attendant, kitchen helper, and cleaner II. Tr. 31. Therefore, the ALJ concluded Plaintiff was not under a disability, as

ORDER - 7

defined in the Social Security Act, from the alleged onset date of March 4, 2014, through the date of the decision.[3]  Tr. 31.

On November 28, 2018, the Appeals Council denied review of the ALJ's decision, Tr. 1-8, making the ALJ's decision the Commissioner's final decision for purposes of judicial review.  *See* 42 U.S.C. § 1383(c)(3).

## ISSUES

Plaintiff seeks judicial review of the Commissioner's final decision denying her disability insurance benefits under Title II of the Social Security Act.  Plaintiff raises the following issues for review:

1.  Whether the ALJ properly assessed Plaintiff's ability to speak, read, and write in English;

2.  Whether the ALJ properly evaluated the medical opinion evidence; and

3.  Whether the ALJ properly evaluated Plaintiff's symptom claims.

ECF No. 15 at 2.

_____

[3] The ALJ found that Plaintiff was not under a disability through the date of the decision, even though Plaintiff requested a closed period of disability ending on February 28, 2016.  Tr. 22, 31.

ORDER - 8

## A. Ability to Speak, Read, and Write in English

Plaintiff argues that the ALJ erred at steps 4 and 5 by finding that Plaintiff was able to return to her past relevant work and adjust to other work in the national economy without a proper assessment of her ability to speak, read, and write in English. ECF No. 15 at 4. As discussed *infra*, Defendant concedes that the ALJ erred at step four by finding that Plaintiff was capable of performing past relevant work. ECF No. 16 at 10. Because both parties agree that the ALJ erred at step four, only step five will be addressed as it relates to the ALJ's assessment of Plaintiff's ability to speak, read, and write in English.

The ALJ found at step five that considering Plaintiff's age, education, work experience, RFC, and testimony from a vocational expert, there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as linen room attendant, kitchen helper, and cleaner II. Tr. 30-31. In making her step five determination, the ALJ found that Plaintiff had at least a high school education and was able to communicate in English. Tr. 30 (citing 20 CFR § 404.1564). Under the Social Security regulations, "illiteracy" is defined as "the inability to read or write," 20 C.F.R. § 404.1564(b)(1), while the "ability to communicate in English" is defined as "the ability to speak, read and understand English." 20 C.F.R. § 404.1564(b)(5). The Ninth Circuit has held that these two

requirements "will have inevitable overlap," as "[i]t is reasonable . . . to assume that one who is unable to speak and understand English will also be unable to read and write English." *Chavez v. Dep't of Health and Human Services*, 103 F.3d 849, 852 (9th Cir. 1996). In assessing illiteracy, only the ability to read or write in English is considered for Social Security Administration (SSA) disability purposes. *See id*. The SSA considers a claimant illiterate if he or she "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 404.1564(b)(1). Further, an illiterate person generally "has had little or no formal schooling." *Id*. Depending on the claimant's age, impairments, and past work experience, illiteracy may render a claimant disabled. *See generally* 20 C.F.R. App'x 2 to Subpart P of Part 404. Plaintiff argues that the ALJ's inaccurate finding that she was able to communicate in English and had at least a high school education led to an improper determination that Plaintiff could perform other work in the national economy, particularly as it related to the reasoning and language levels of the jobs identified by the vocational expert. ECF No. 15 at 6-7 (citing Tr. 30). Defendant contends the vocational expert testified that the identified jobs could be performed by someone with little to no English language abilities and thus, the ALJ reasonably determined that Plaintiff's "language barriers" did not prevent her from performing these jobs. ECF No. 16 at 16.

ORDER - 10

The ALJ's decision is silent as to how she reached her conclusion that Plaintiff was able to communicate in English.[4]  Tr. 30.  It is the Commissioner's burden to establish that a claimant is literate.  *Silveira v. Apfel*, 204 F.3d 1257, 1261–62 (9th Cir. 2000).  As argued by Plaintiff, the record includes evidence that Plaintiff was unable to speak, read, or write in English.  ECF No. 15 at 6; *see, e.g.,* Tr. 38 (Plaintiff required a Spanish interpreter at her hearing); Tr. 248 (Plaintiff reported that she did not speak, understand, or read English and could not write more than her name in English); Tr. 46 (Plaintiff testified that she completed high school in Mexico); Tr. 46 (Plaintiff testified she had been in the United States since 2001 and picked up "[n]ot a lot" of English, and she has never taken an English as a second language class); Tr. 47 (Plaintiff testified that her son completed her function report by reading the questions to her and then writing the responses, and

---

[4] The ALJ also failed to develop the record as to Plaintiff's education.  Although Plaintiff finished high school, her education took place in Mexico.  Tr. 46.  The SSA considers "a person's ability to communicate in English" when evaluating the claimant's work capacity, "regardless of the amount of education the person may have in another language."  20 C.F.R. § 404.1564(b)(5).  Thus, the Court focuses its inquiry on Plaintiff's ability to communicate in English rather than her formal education.

ORDER - 11

Plaintiff only signed it); Tr. 371, 385 (Spanish language is continually noted throughout Plaintiff's treatment notes); Tr. 377, 383 (At times, an interpreter was present for Plaintiff's treatment); Tr. 352-53 (Dr. Schultz noted that based on Plaintiff's failure to attempt to read a consent form written in Spanish, it was possible that Plaintiff was entirely illiterate). Defendant argues that the ALJ specifically directed the vocational expert to consider an individual who "speaks little or no English" when determining whether Plaintiff was capable of performing other jobs. ECF No. 16 at 17, 20 (citing Tr. 51-52). However, the ALJ did not direct the vocational expert to consider an individual who was unable to read or write in English, and the vocational expert offered no explanation as to the apparent deviation from the Dictionary of Occupational Titles (DOT) as to the language requirements for the jobs she identified. Tr. 51-55. The ALJ did not make a specific finding as to Plaintiff's literacy because she did not make any finding regarding Plaintiff's ability to read or write in English, despite the fact that an inability to read or write may render a claimant illiterate. The ALJ's conclusion that Plaintiff could communicate in English is not supported by evidence in the record. To the contrary, the record evidence supports a finding that Plaintiff was unable to communicate in English, as evidence shows Plaintiff's inability to speak, read or understand English. 20 C.F.R. § 404.1564(b)(5). The ALJ therefore failed to meet her burden of establishing whether Plaintiff is literate, *Silveira*, 204 F.3d at

1261–62, and the Court cannot affirm her finding that Plaintiff is able to communicate in English.

This error is not harmless. An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Molina,* 674 F.3d at 1115 (quotation and citation omitted). The vocational expert testified that the jobs of linen room attendant, kitchen helper, and cleaner II were available to an individual with Plaintiff's limitations, which included speaking little or no English. Tr. 51. However, the vocational expert was not asked to consider the ability to read or write in English despite substantial evidence that Plaintiff had limitations in her ability to read and write in English. Tr. 51-55. The ALJ's failure to fully develop the record with respect to Plaintiff's literacy and ability to communicate in English was therefore not inconsequential to the ALJ's ultimate nondisability determination. On remand, the ALJ is instructed to further develop the record as to Plaintiff's literacy and the ability to communicate in English, and to conduct a renewed step five/RFC analysis.

**B.    Medical Opinion Evidence**

Plaintiff challenges the ALJ's evaluation of the medical opinions of Matthew Comrie, Psy.D., James Bailey, Ph.D., and Jennifer Schultz, Ph.D. ECF No. 15 at 9-17.

There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing] physicians)." *Holohan v. Massanari*, 246 F.3d 1195, 1201-02 (9th Cir. 2001) (citations omitted). Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a reviewing physician's opinion. *Id.* at 1202. "In addition, the regulations give more weight to opinions that are explained than to those that are not, and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists." *Id.* (citations omitted).

If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it only by offering "clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). "However, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2011) (internal quotation marks and brackets omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported

by substantial evidence." *Bayliss*, 427 F.3d at 1216 (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). The opinion of a nonexamining physician may serve as substantial evidence if it is supported by other independent evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 1. Dr. Comrie and Dr. Bailey

State agency psychological consultants, Matthew Comrie, Psy.D. and James Bailey, Ph.D., reviewed the medical record and opined that Plaintiff could understand, remember, and carry out simple routine tasks in a predictable work environment without high-paced production quotas. Tr. 66, 80. They opined that Plaintiff could accept supervision, and would do best with one-on-one or small group interactions with no public contacts. Tr. 65-66, 78-79. The ALJ gave great weight to the opinions of Drs. Comrie and Bailey. Tr. 29.

The ALJ gave great weight to the opinions of the nonexamining psychologists, but failed to account for, or discuss reasons for rejecting, both doctors' opined restriction from work with high-paced production quotas in the RFC. Tr. 25. Because the opinions of Drs. Comrie and Bailey were contradicted

by the examining opinion of Jennifer Schultz, Ph.D.,[5] Tr. 351-53, the ALJ was required to provide specific and legitimate reasons for discounting their opinions. *Bayliss*, 427 F.3d at 1216. Instead, the ALJ fully credited the opinions of Drs. Comrie and Bailey as to Plaintiff's limitations.

However, in fashioning the RFC, the ALJ did not include a limitation involving high-paced production quotas. Tr. 25. The ALJ did not explain her reasons for rejecting Drs. Comrie and Bailey's opined limitation. The ALJ is required to set forth the reasoning behind his or her decisions in a way that allows for meaningful review. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (finding a clear statement of the agency's reasoning is necessary because the Court can affirm the ALJ's decision to deny benefits only on the grounds invoked by the ALJ). "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014). The ALJ's rationale for formulating Plaintiff's RFC without a restriction related to high-paced production

---

[5] Dr. Schultz found that Plaintiff's current level of functioning and her prognosis was poor but did not provide any functional restrictions as to Plaintiff's ability to work. Tr. 351-53.

quota jobs is absent, and therefore unsupported in this case. The ALJ failed to provide specific and legitimate reasons supported by substantial evidence for discounting the opinions of Drs. Comrie and Bailey that Plaintiff was limited to jobs without high-paced production quotas, while stating that she assigned great weight to their opinions. Defendant concedes that the ALJ erred in failing to account for, or provide valid reasons to reject, this limitation but asserts that the error was harmless in light of the vocational expert's testimony that Plaintiff was capable of performing other jobs in the national economy. ECF No. 16 at 10. The Court finds that the ALJ committed reversible error by failing to include a high-paced production quota limitation in the RFC, or to provide reasons for rejecting this limitation.

This error is not harmless. The harmless error analysis may be applied where even a treating source's opinion is disregarded without comment. *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). An error is harmful unless the reviewing court "can confidently conclude that no reasonable ALJ, when fully crediting the [evidence], could have reached a different disability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006). Here, Drs. Comrie and Bailey, nonexamining physicians, opined that Plaintiff had limitations that restricted her ability to work in a job with high-paced production quotas. Tr. 66, 80. The vocational expert testified that an inability to perform

work with high-paced production quotas would eliminate all of Plaintiff's past relevant work.  Tr. 53.  Although Defendant contends that this error at step four was harmless because at step five the vocational expert identified other jobs that Plaintiff could perform despite this specific limitation, as discussed *supra*, the ALJ erred in her step five analysis by failing to properly assess Plaintiff's ability to speak, read, and write in English.  Based on this record, the Court cannot confidently conclude that the disability determination would remain the same were the RFC to properly incorporate the entirety of Drs. Comrie and Bailey's fully credited opinions.

Plaintiff also argues that the ALJ failed to account for, or provide reasons for rejecting, two other limitations opined by the nonexamining physicians despite fully crediting these opinions.  ECF No. 15 at 11; *see* Tr. 65 (Dr. Comrie opined that Plaintiff could perform simple routine tasks, "but not on a consistent basis"); *see also* Tr. 65, 78 (Drs. Comrie and Bailey opined Plaintiff would do best with simple routine tasks with one-on-one demonstrations and repetition).  Because the ALJ is instructed on remand to reevaluate the medical opinion evidence, the Court declines to address these challenges here.  However, if the ALJ is to discount additional limitations opined by the nonexamining psychologists, the ALJ must address these specific limitations and the reasons for discounting them.  Tr. 482; *see* 20 C.F.R. § 404.1527(c) (The ALJ must evaluate every medical opinion

received according to a list of factors set forth by the Social Security Administration).  On remand, the ALJ is instructed to reassess the medical opinion evidence and to pose hypotheticals to the vocational expert that include all of the credited limitations, and to provide specific and legitimate reasons supported by substantial evidence for discounting any opined limitations.

### 2. Dr. Schultz

On August 5, 2014, clinical psychologist Jennifer Schultz, Ph.D., conducted a psychological evaluation of Plaintiff.  Tr. 351-53.  Dr. Schultz found that Plaintiff may be illiterate, her current level of functioning was poor, her prognosis was poor because she lacked health insurance or the ability to pay for treatment, she had concrete thinking, her memory was fair to poor, her social interaction was limited, and her ability to tolerate or adapt to stress was poor.  Tr. 353.

The ALJ gave Dr. Schultz's opinion little weight.  Tr. 29.  Because Dr. Schultz's opinion was contradicted by the nonexamining opinions of Drs. Comrie and Bailey, Tr. 65-66, 78-80, the ALJ was required to provide specific and legitimate reasons for discounting Dr. Schultz's opinion.  *Bayliss*, 427 F.3d at 1216.

### a.     Familiarity with the Record

The ALJ discredited Dr. Schultz's opinion because Dr. Schultz did not review the entire record.  Tr. 29.  The extent to which a medical source is "familiar

with the other information in [the claimant's] case record" is relevant in assessing the weight of that source's medical opinion. *See* 20 C.F.R. § 404.1527(c)(6). The ALJ noted that Dr. Schultz only reviewed records from one of Plaintiff's medical appointments in March 2014, and therefore, she was unaware of the longitudinal picture of Plaintiff's psychological impairments. Tr. 29, 351. The fact that Dr. Schultz was not familiar with Plaintiff's treatment notes or medical record was a specific and legitimate reason to discount her opinion as to Plaintiff's reports of post-traumatic stress disorder and depression.

> b.  Relies on Self-Reports

The ALJ discounted Dr. Schultz's opinion because she relied on Plaintiff's self-reports. Tr. 29. A physician's opinion may be rejected if it is based on a claimant's subjective complaints, which were properly discounted. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989). However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). Some reliance on self-reports is appropriate, as psychiatric diagnoses "will always

depend in part on the patient's self-report, as well as on the clinician's observations of the patient." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017).

Here, Dr. Schultz reviewed only one treatment record and noted that her report of Plaintiff's memory impairment was based on Plaintiff's report. Tr. 351, 353. Dr. Schultz conducted a mental status examination and noted that Plaintiff's affect was constricted, her body movement was restless and shaking, she reported her mood as "very scared" because she did not sleep a lot, she was unable to perform the serial sevens, missed one number in the serial threes, and was unable to identify the states surrounding Washington. Tr. 352-53. Dr. Schultz also noted that Plaintiff was dressed appropriately, she was cooperative, her speech was normal, she had good eye contact, and her thought content and stream of thought were within normal limits. Tr. 352-53. She reported no hallucinations, did not demonstrate delusional thinking, and denied current suicidal ideation. Tr. 353. Further, there is no evidence that an interpreter was present at the mental status examination to assist in communication between Dr. Schultz and Plaintiff. Tr. 351-53. Thus, Dr. Schultz's opinion is likely based more heavily on Plaintiff's self-reports than on clinical observations. However, as discussed *infra*, the ALJ erred in discrediting Plaintiff's symptom claims, therefore this was not a specific and legitimate reason to reject Dr. Schultz's opinion. Because this case is

remanded on other grounds, the Court declines to engage in harmless error analysis here.

### c. Opines No Functional Limitations

The ALJ discredited Dr. Schultz's opinion because she used vague and undefined terms that failed to provide an accurate function-by-function picture of the most Plaintiff could do despite her impairments. Tr. 29. An ALJ may reject an opinion that does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity." *See Morgan*, 169 F.3d at 601. Dr. Schultz's opinion was vague as to Plaintiff's functional limitations. Tr. 353. Her use of the terms "poor," "impacted," "limited," and "impaired," in her prognosis and medical source statement without further explanation about Plaintiff's capacity to work was a specific and legitimate reason to discount her opinion.

### d. Inconsistent with Medical Evidence

The ALJ discounted Dr. Schultz's opinion because the limitations she assessed were not consistent with the medical evidence of record. Tr. 29. Relevant factors when evaluating a medical opinion include the amount of relevant evidence that supports the opinion and the consistency of the medical opinion with the record as a whole. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). The ALJ found that the medical

evidence showed Plaintiff "did better when she took medications as prescribed but she had a pervasive pattern of non-compliance (e.g., stopping medications on her own)." Tr. 29. As discussed *infra*, the ALJ's finding that Plaintiff had a pattern of noncompliance with her medications was not supported by substantial evidence in the record. Therefore, this was not a specific and legitimate reason to reject Dr. Schultz's opinion. Because this case is remanded on other grounds, the Court declines to engage in harmless error analysis here.

## C.     Plaintiff's Symptom Claims

Plaintiff faults the ALJ for failing to rely on clear and convincing reasons in discrediting her symptom claims. ECF No. 15 at 17-21. An ALJ engages in a two-step analysis to determine whether to discount a claimant's testimony regarding subjective symptoms. SSR 16–3p, 2016 WL 1119029, at *2. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112 (quotation marks omitted). "The claimant is not required to show that [the claimant's] impairment could reasonably be expected to cause the severity of the symptom [the claimant] has alleged; [the claimant] need only show that it could reasonably have caused some degree of the symptom." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim*, 763 F.3d at 1163 (citations omitted). General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims. *Id*. (quoting *Lester*, 81 F.3d at 834; *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why it discounted claimant's symptom claims)). "The clear and convincing [evidence] standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

Factors to be considered in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning an individual's functional limitations and restrictions due to

pain or other symptoms. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c). The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *2.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence. Tr. 26-27.

### 1. Inconsistent with Medical Evidence of Record

The ALJ found that the medical evidence of record did not support the severity of Plaintiff's alleged symptoms from March 4, 2014 through February 28, 2016. Tr. 27. An ALJ may reject limitations that are "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin*., 359 F.3d 1190, 1195 (9th Cir. 2003). The ALJ noted that Plaintiff reported being unable to work because her depression, nerves, and medications prevented her from being able to function, and her condition eventually stabilized enough for her to return to work in March 2016. Tr. 26, 43 (citing Tr. 257). However, the ALJ determined that the record revealed Plaintiff's allegedly disabling impairments were present at approximately the same level of severity prior to the alleged onset date and she was able to work both before and after her alleged closed period of disability. Tr. 27; *see* Tr. 385, 409

(Plaintiff had "taken other antidepressants since the age of 25 years old"); *see Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992) (working with an impairment supports a conclusion that the impairment is not disabling). Plaintiff asserts that although she has had long-term mental health limitations, the record indicates that her symptoms significantly worsened around her alleged onset date. ECF No. 15 at 17; *see, e.g.,* Tr. 346 (December 2012: Plaintiff had been off her Paxil medication for one to two weeks, but she only requested help to treat nausea and decided to stay off selective serotonin reuptake inhibitors (SSRIs) at present); Tr. 343-45, 390 (March-May 2013: Plaintiff's next few medical visits all had to do with physical conditions); Tr. 342 (January 2014: Plaintiff was anxious and requested medication for sleep and anxiety); Tr. 341 (March 2014: Plaintiff presented crying, wanted her life to be over, found the medications ineffective, and had a tremor); Tr. 340 (April 2014: Plaintiff was fatigued and not eating much, planned to hang herself); Tr. 335 (June 2014: despite her anemia being controlled, Plaintiff felt weak and nauseated); Tr. 353 (August 2014: Dr. Schultz found Plaintiff's functioning was poor); Tr. 384 (December 2014: when Trazadone was restarted, Plaintiff still only experienced forty percent benefit to her sleep, and her mood and affect were anxious); Tr. 381 (January 2015: Plaintiff was motivated to be happy, but her mood and affect were still sad); Tr. 383 (January 2015: Plaintiff was panicking in stores, sleeping more, and had to sit in the back of the church);

Tr. 376 (March 2015: Plaintiff had progressed to going out to eat with her family twice despite panic, and she was trying not to stay in bed all day when depressed); Tr. 374 (May 2015: Plaintiff was sad and self-conscious three to four days per week and was afraid to go out independently, and her speech was slightly pressured and rapid); Tr. 372 (July 2015: Plaintiff felt weak and "down"). Plaintiff argues that the record showed that after returning to work in March 2016, she was primarily concerned with her allergies, wanted to be maintained on medications, and did not need to see a counselor. ECF No. 15 at 18-19 (citing Tr. 367). Defendant asserts that Plaintiff was able to work in the past despite her impairments, as Plaintiff reported she was "born sad," she had been on antidepressants since she was 25 years old, and she took medication to treat depression and anxiety when she was working in 2012. ECF No. 16 at 7 (citing Tr. 346, 409).

While the ALJ determined the record showed Plaintiff's psychological allegations were "managed with medications" and she "was reasonably functional despite some limitation," Tr. 27, the ALJ did not cite to any evidence in the record to support her statements other than a record that showed Plaintiff had been on antidepressants since she was 25 years old. Tr. 385, 409. Further, the ALJ determined that Plaintiff's claims of exacerbation of her mental health symptoms during the alleged closed period of disability were attributable to situational

stressors, apparently acknowledging that there was record evidence of increased symptoms around her onset date. Tr. 27 The ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster her findings. *See, e.g., Holohan*, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in a claimant's records while ignoring others). The ALJ's characterization of the record is not supported by substantial evidence. Tr. 27.

### 2. Improvement with Treatment

The ALJ found that Plaintiff's mental health symptoms improved when she took recommended medications. Tr. 27. The effectiveness of treatment is a relevant factor in determining the severity of a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (determining that conditions effectively controlled with medication are not disabling for purposes of determining eligibility for benefits); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (recognizing that a favorable response to treatment can undermine a claimant's complaints of debilitating pain or other severe limitations). The ALJ noted that Plaintiff reported symptoms that prevented her from working, such as depression, hopelessness, anxiety, and disturbed sleep. Tr. 26 (citing Tr. 257, 280, 286). The ALJ found that medication was effective at reducing Plaintiff's mental health symptoms. Tr. 27; *see* Tr. 384 (December 23,

2014: Plaintiff was prescribed Trazodone a couple of days earlier and reported that it mildly helped her sleep); Tr. 378 (March 6, 2015: Plaintiff noted a slight improvement with her post-traumatic stress disorder and needed a medication refill); Tr. 374 (May 5, 2015: Plaintiff recently started taking Seroquel nightly and it vastly improved her sleep, and although she still felt sad and self-conscious several days of the week, she felt overall improved); Tr. 397, 399 (July 17, 2017: Plaintiff reported her depression was becoming more stable with Sertraline, and she only had lingering sleep problems).  On this record, the ALJ reasonably concluded that when treated with prescribed medications, Plaintiff's depression and insomnia were not as limiting as Plaintiff claimed.

### 3. *Minimal Mental Health Treatment*

The ALJ found Plaintiff's symptom reporting was undermined by her noncompliance with medication, and that the lack of treatment for her mental health symptoms did not support her alleged level of impairment.  Tr. 27.  An unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment may be considered when evaluating a claimant's subjective symptoms.  *Orn*, 495 F.3d at 638; *see also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (same).  Evidence of a claimant's self-limitation and lack of motivation to seek treatment are appropriate considerations in determining the credibility of a claimant's subjective symptom reports.  *Osenbrock v. Apfel*,

240 F.3d 1157, 1165-66 (9th Cir. 2001); *Bell-Shier v. Astrue*, 312 Fed. App'x 45,

*2 (9th Cir. 2009) (unpublished opinion) (considering why plaintiff was not

seeking treatment).  When there is no evidence suggesting that the failure to seek

or participate in treatment is attributable to a mental impairment rather than a

personal preference, it is reasonable for the ALJ to conclude that the level or

frequency of treatment is inconsistent with the alleged severity of complaints.

*Molina*, 674 F.3d at 1113-14.  But when the evidence suggests lack of mental

health treatment is partly due to a claimant's mental health condition, it may be

inappropriate to consider a claimant's lack of mental health treatment when

evaluating the claimant's failure to participate in treatment.  *Nguyen v. Chater*, 100

F.3d 1462, 1465 (9th Cir. 1996).

Here, the ALJ found the evidence showed Plaintiff had a "pattern" of not

taking her medications as prescribed and cited a treatment note from July 2017

where a provider reported that Plaintiff "decides on her own to start and stop

meds," and noted this had been the case at every appointment.  Tr. 27 (citing Tr.

397).  However, the ALJ failed to consider that evidence in the record showed

Plaintiff stopped some of her prescribed medications due to negative side effects.

*See* Tr. 385 (December 16, 2014: Plaintiff reported she stopped Bupropion because

she was experiencing vertigo, and the vertigo was resolved when she stopped the

medication); Tr. 404 (June 13, 2017: Plaintiff stopped taking Zoloft due to its side

effects, as it was causing her to feel "crazy," she was not feeling well on the medication, and was unable to work for a couple of days).

The ALJ also found the evidence showed Plaintiff did not receive the extent of medical treatment one would expect for a totally disabled individual. Tr. 27. The ALJ noted that Plaintiff only had three sessions with a counselor at the Union Gospel Mission Clinic in 2014, Tr. 340-42, she did not receive treatment for psychological concerns from April 2014 through December 2014, Tr. 384-88, and she received very little treatment throughout 2015, Tr. 372-83. Tr. 27. Although the record does indicate that Plaintiff did not seek frequent counseling, the evidence also indicates that Plaintiff's financial situation and lack of insurance contributed to Plaintiff's lack of mental health treatment. *See* Tr. 383 (January 27, 2015: treatment note reported that Plaintiff "[h]as medical coupon again thus she is able to get medical care"); *see also* Tr. 353 (August 5, 2014: Dr. Schultz acknowledged that Plaintiff has had minimal therapy to address her anxiety and depression, and reported, "[Plaintiff] does not have health insurance and cannot pay for treatment that would increase her ability to function at home and help her be able to leave her house."). The ALJ is required to consider Plaintiff's reasons for noncompliance with treatment. Here, the ALJ's discussion of Plaintiff's noncompliance did not consider whether Plaintiff's noncompliance with medications or mental health counseling was sufficiently explained. Tr. 644; *see*

*Molina*, 674 F.3d at 1113-14.  This reason for discounting Plaintiff's symptom complaints is not supported by substantial evidence.

### 4. Situational Stressors

The ALJ found that Plaintiff's claims of exacerbation of her mental health symptoms were attributable to situational stressors.  Tr. 27.  An ALJ may reasonably find a claimant's symptom testimony less credible where the evidence "squarely support[s]" a finding that the claimant's impairments are attributable to situational stressors rather than impairments.  *Wright v. Colvin*, No. 13-CV-3068-TOR, 2014 WL 3729142, at *5 (E.D. Wash. July 25, 2014) ("Plaintiff testified that she would likely be able to maintain full-time employment but for the 'overwhelming' stress caused by caring for her family members").  However, "because mental health conditions may presumably *cause* strained personal relations or other life stressors, the Court is not inclined to opine that one has caused the other based only on the fact that they occur simultaneously."  *Brendan J. G. v. Comm'r, Soc. Sec. Admin.*, No. 6:17-CV-742-SI, 2018 WL 3090200, at *7 (D. Or. June 20, 2018) (emphasis in original).

The ALJ identified evidence of Plaintiff's anger towards her father, her husband's frequent absence from the home due to his job as a truck driver, and her son's legal problems as situational stressors.  Tr. 27; *see, e.g.,* Tr. 409 (May 2017: Plaintiff alleged "excessive anger toward her father because he is to blame for her

stressful life" as he abandoned her family when she was a child); Tr. 45-46, 408

(Plaintiff's husband is only home every 10 days due to his job as a truck driver);

Tr. 353 (August 2014: Plaintiff reported being "traumatized by the arrest of her

son," and endorsed nightmares, worry, and intrusive thoughts about her son's

safety); Tr. 385 (December 2014: Plaintiff reported that "she got really sick," and

"she could not function after her eldest son was accused of kidnapping and was

sentenced to prison"). The ALJ observed that in January 2015, Plaintiff reported to

providers that she was feeling better and functioning better now that her son had

been released from prison and was on house arrest. Tr. 28 (citing Tr. 383). The

ALJ also noted that this report coincided with Plaintiff seeking mental health

treatment again, adjusting her medications, and taking her medications more

consistently. Tr. 28.

Plaintiff's stress related to anger towards her father is not clearly separable

from Plaintiff's mental impairments. She reported that her father abandoned her

family when her mother was pregnant with Plaintiff and she was moved around to

different family members as a child. Tr. 409. There is nothing in the record to

indicate that Plaintiff's "excessive anger" towards her father exacerbated her

mental health symptoms around the time of her alleged disability onset date. Tr.

409. Moreover, although the ALJ cites to evidence in the record that Plaintiff's

mental health symptoms increased when her husband was gone, Tr. 341, 383, 408,

there is nothing in the record to indicate that her husband became a truck driver around the time of her alleged disability onset date, or that his job began taking him away from home more often around that time. Unlike prior cases in this district, where the record clearly contained evidence that the claimant would have been capable of working but for the presence of a specific situational stressor, these situational stressors are more complex and intertwined with Plaintiff's impairments. *See Wright*, 2014 WL 3729142, at *5. However, the record demonstrates that Plaintiff's alleged symptoms and increased stress directly coincided with her son's arrest and prison sentence for kidnapping his girlfriend. Tr. 27, *see, e.g.,* Tr. 342 (January 28, 2014: Plaintiff was anxious because her son "went love crazy and team kidnapped his [girlfriend]"); Tr. 351, 353 (August 5, 2014: Plaintiff reported that "she was traumatized by the arrest of her son," and she had nightmares and intrusive thoughts about her son's safety); Tr. 383 (January 27, 2015: Plaintiff reported that she has had depression for as long as she could remember, but the year before it "was even worse to the point where she lost her job," and she was in bed for six months due to problems with her then 17 year old son because he went to jail for kidnapping his girlfriend); Tr. 409 (May 30, 2017: "This last year she got really sick" and "she could not function after her eldest son was accused of kidnapping and was sentenced to prison"). Further, her mental health symptoms appeared to decrease when her son was released from prison. Tr.

383 (January 27, 2017: Plaintiff had been feeling better because her son was released from jail and was on house arrest).  Thus, the record contained evidence that Plaintiff would have been capable of working but for the presence of a specific situational stressor, her son's arrest and incarceration.  *See Wright*, 2014 WL 3729142, at *5.  This finding is supported by substantial evidence.

### 5. *Inconsistent Statements*

The ALJ also found Plaintiff's allegations that she could not work due to her mental impairments were undermined by Plaintiff's inconsistent reporting in the record.  Tr. 28.  In evaluating a claimant's symptom claims, an ALJ may consider the consistency of an individual's own statements made in connection with the disability review process with any other existing statements or conduct under other circumstances.  *Smolen*, 80 F.3d at 1284 (The ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid.").  The ALJ noted inconsistencies in Plaintiff's statements about her ability to drive and shop during the alleged period of disability.  Tr. 28.  However, as argued by Plaintiff, the ALJ relied on evidence that did not reveal inconsistencies in Plaintiff's reports.  ECF No. 15 at 20; *compare* Tr. 48 (Plaintiff testified that she stopped driving because she "would always get lost") *with* Tr. 351-52 (August 2014: Plaintiff drove to her consultative psychological evaluation,

but told the provider that "sometimes she is too afraid to drive," and she "gets lost when she drives"); *and with* Tr. 260 (July 2014: Plaintiff reported that she drives sometimes but she was mostly driven around by others); *compare* Tr. 260 (July 2014: Plaintiff reported she shops in stores for clothes or food and she does that once a month for an hour and a half); *with* Tr. 46 (Plaintiff testified that she "wasn't able to go to the store," but that sometimes when she would go places, she would get lost "and that's why I stopped just going out," that she "wouldn't even have any strength to push the grocery cart," and felt like she "needed air"); *and with* Tr. 49 (Plaintiff testified that after her period of alleged disability, she was able to grocery shop "a lot better than before.") Further, the ALJ noted that in her July 2014 Function Report, Plaintiff reported that she could cook and prepare meals, clean, do laundry, care for pets, drive, and shop, she could perform her own personal care although she did not always feel like doing it, and she was social with her family every day and attended church weekly.[6] Tr. 28 (citing Tr. 258-61). The ALJ observed that in August 2014, she similarly described an adequate level

_____

[6] Plaintiff reported in her July 2014 Function Report that she attended church "every once in a while." Tr. 261. A month later, in August 2014, Plaintiff reported that she started weekly attendance at church "about a month ago." Tr. 352.

of activities of daily living, including housework, preparing simple meals, doing laundry, and attending church. Tr. 352. However, the ALJ noted that Plaintiff's September 2014 Disability Report indicated she did not go anywhere, not even to the store, and "[s]he cannot even process how to put a meal together and cooks only very simple step meals *as of last month*." Tr. 28 (citing Tr. 283) (emphasis added). The ALJ failed to note that Plaintiff reported in August 2014 that she spent her days in her house, did not want to do anything and would sit on the couch for up for two hours each day, made food that was easy to prepare, her husband did the shopping and managed the money, and she used to take her children places like the park and school, but no longer liked to do anything. Tr. 352. On this record, the ALJ's finding that Plaintiff offered inconsistent statements as a basis to discount her symptom complaints is not supported by substantial evidence.

### 6. *Inconsistent with Daily Activities*

The ALJ found that Plaintiff's daily activities were inconsistent with the level of impairment Plaintiff alleged. Tr. 28. The ALJ may consider a claimant's activities that undermine reported symptoms. *Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001). If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or nonexertional functions, the ALJ may find these activities inconsistent with the reported disabling symptoms. *Fair*, 885 F.2d at 603; *Molina*, 674 F.3d at 1113. "While a claimant need not

vegetate in a dark room in order to be eligible for benefits, the ALJ may discount a claimant's symptom claims when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting" or when activities "contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1112-13.

The ALJ indicated that Plaintiff reported she could not work due to her disabling mental health symptoms, which included being easily irritated and avoiding others, and almost daily panic attacks. Tr. 26 (citing Tr. 262-63, 280). The ALJ then highlighted that Plaintiff was social with her family every day, attended church weekly, cooked simple meals, cleaned, did laundry, cared for pets, drove, shopped, and was able to care for her son and get him ready for school. Tr. 28 (citing Tr. 45, 258-61, 280, 352, 374, 376). The ALJ deemed these independent living activities to be inconsistent with Plaintiff's reports of disabling symptoms. Tr. 28. Although the ALJ accurately summarized Plaintiff's reported activities, these activities as briefly described in the record, are insufficient—either individually or cumulatively—to indicate that Plaintiff's capacities are transferable to a work setting or contradict claims of a totally debilitating impairment. As argued by Plaintiff, her activities were limited during the relevant period consistent with her testimony, and because her activity level slowly improved as she made her recovery is not an adequate reason to discount her symptom reports. ECF No.

15 at 21; *see, e.g.,* Tr. 341 (March 2014: Plaintiff was not interacting with her son and she was only making prepared meals); Tr. 352 (August 2014: Plaintiff noted she had been getting family help for housework, she was making easy food, her husband did the shopping, and she did not even enjoy going to the park or school or to see friends); Tr. 280, 283 (September 2014: Plaintiff reported breaking down when she was alone outside her house and she needed her husband to get her, she sometimes needed help bathing and dressing, she was only making simple meals and doing some dishes, and her husband needed to take her to appointments); Tr. 383 (January 2015: she sat in the back of the church and panicked in stores, but she could now shower and manage to cook); Tr. 374 (May 2015: she was going to church with family, but she was afraid to go out alone and felt people were watching her). This was not a clear and convincing reason to discount Plaintiff's reported symptoms.

In sum, the ALJ failed to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's symptom reports. Because this case is remanded on other grounds, the Court declines to engage in harmless error analysis here. On remand, the ALJ is instructed to reconsider Plaintiff's symptom reports.

**D.    Remedy**

Plaintiff urges this Court to remand for an immediate award of benefits. ECF No. 17 at 5, 7-8, 10-11.

"The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)).  When the Court reverses an ALJ's decision for error, the Court "ordinarily must remand to the agency for further proceedings." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler*, 775 F.3d at 1099. However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met.  *Garrison*, 759 F.3d at 1020 (citations omitted).  Under the credit-as-true rule, where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, the Court will remand for an award of benefits.

*Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017). Even where the three prongs have been satisfied, the Court will not remand for immediate payment of benefits if "the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, further proceedings are necessary. As discussed *supra*, the ALJ erred by failing to fully develop the record as to Plaintiff's ability to speak, read, and write in English, and by failing to properly evaluate the opinions of Drs. Comrie and Bailey regarding Plaintiff's mental functional limitations. However, the opinions of Drs. Comrie and Bailey were contradicted by the examining opinion of Dr. Schultz, who did not assign any functional limitations to Plaintiff's ability to perform work. Tr. 351-53. The ALJ gave Dr. Schultz's opinion little weight. Tr. 29. Even if the ALJ were to have fully incorporated the credited opinions of Drs. Comrie and Bailey into the RFC, the evidence would present an outstanding conflict for the ALJ to resolve. Therefore, further proceedings are necessary for the ALJ to resolve potential conflicts in the evidence and fully develop the record. On remand, the ALJ is instructed to conduct a new sequential analysis, including developing the record as to Plaintiff's ability to speak, read, and write in English, reassess the medical opinion evidence, and reconsider Plaintiff's symptom testimony and analyses at steps four and five. The ALJ is instructed to take testimony from a vocational expert in light of the renewed sequential analysis.

# CONCLUSION

Having reviewed the record and the ALJ's findings, the Court concludes the ALJ's decision is not supported by substantial evidence and free of harmful legal error. Accordingly, **IT IS HEREBY ORDERED**:

1. The District Court Executive is directed to substitute Andrew M. Saul as the Defendant and update the docket sheet.

2. Plaintiff's Motion for Summary Judgment, **ECF No. 15**, is **GRANTED**.

3. Defendant's Motion for Summary Judgment, **ECF No. 16**, is **DENIED**.

4. The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff REVERSING and REMANDING the matter to the Commissioner of Social Security for further proceedings consistent with this recommendation pursuant to sentence four of 42 U.S.C. § 405(g).

The District Court Executive is directed to file this Order, provide copies to counsel, and **CLOSE THE FILE**.

DATED October 7, 2019.

_s/Mary K. Dimke_
MARY K. DIMKE
UNITED STATES MAGISTRATE JUDGE

ORDER - 42